Filed 5/6/13  P. v. Griffin CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NICKY GRIFFIN,<br><br>    Defendant and Appellant. | B237300<br><br>(Los Angeles County<br>Super. Ct. No. MA053636) |

        APPEAL from a judgment of the Superior Court of Los Angeles County. Akemi Arakaki, Judge.  Affirmed.

        David Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Sonya Roth, Deputy Attorneys General, for Plaintiff and Respondent.

                    _____

Appellant Nicky Griffin, married to the victim, Carolyn Jordan, was charged with inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)),[1] a felony, with attempted second degree robbery (§§ 664, 211) and with false imprisonment (§ 236). A jury found appellant guilty of the lesser included offense of misdemeanor battery on the first count and not guilty of attempted robbery. The jury deadlocked on the false imprisonment charge and the court declared a mistrial. Imposition of sentence was suspended and appellant was placed on probation, the condition being the time (194 days) served in county jail.[2] The court imposed various fines and assessments that are not at issue. The appeal is from the judgment.

The sole issue on appeal is whether the conviction is supported by substantial evidence.

## FACTS

Two witnesses testified. They were Jordan and Deputy Joshua Epstein of the Los Angeles County Sheriff's Department. Jordan's testimony tended to exonerate appellant, although not entirely. Epstein related a statement that Jordan had made to him less than an hour after the altercation; this statement clearly branded appellant as the assailant.

*Jordan's in-court testimony*

Jordan and appellant lived together in an apartment in Lancaster. On August 4, 2011, Jordan and appellant went to a pawn shop to pawn some of Jordan's jewelry. While negotiations went on between the store owner and Jordan, appellant got up and went outside. Appellant went to the car, got the house key and the garage door key and left the scene. Jordan concluded the deal, left the store and found appellant gone. She drove home; appellant had left the car with her. When Jordan arrived at the house, she found it locked and appellant not there.

---

[1]    All statutory references are to the Penal Code.

[2]    Sentence having been suspended, the appeal is from the order granting probation. (*People v. Berkowitz* (1977) 68 Cal.App.3d Supp. 9, 12.)

2

There now followed several hours during which Jordan walked around and sat and waited for appellant to turn up to open the house. Jordan was walking with the assistance of a cane that was to play a role in this story.[3] She called 911 twice with a request to find appellant and have him taken to the house to open it; these requests were, of course, refused. Around 5:00 p.m., after having been gone for a while, Jordan returned and saw that the garage door was open.

Jordan walked into the garage and saw appellant sitting down by the telephone. She walked past him into the house, only to come back into the garage. She related what happened next: "I opened the door, and I didn't know. Like, I went off or something. All I remember is he was sitting there when I passed by him with the soda in his hand, and when I opened the door, I closed my eyes, and he was standing up, and I just struck at him, and I don't know if I hit him or not, but I know I seen the soda fly out of his hand." Right before she struck appellant, she saw that he was laughing and talking on the phone and was not even looking at her.

Appellant came at her, saying "What's going on with you?" Jordan tried to strike appellant again; she testified she didn't know whether she hit him. Appellant tried to get the cane. Jordan grabbed appellant and tried to throw him to the ground. They both fell down, with appellant landing on top of Jordan. Appellant started to hit Jordan on the left side of her head with an open hand,[4] saying "Calm down, baby. What's wrong? Calm down." As Jordan was calming down, appellant asked her whether she had the money. When she said yes, he told her to hand it to him. She refused. But she shortly relented and told him that if he would let her up, she would give him the money. When he let her up, Jordan jumped up and scratched at his face, but only tore his shirt. She started running; he chased her, stepping on her flip flops, and causing her to fall. She hurt her right elbow in the fall. She got up, ran off and called 911.

---

[3]    She has arthritis in her knee for which she had had surgery.

[4]    She characterized these slaps as "not hard."

*Deputy Epstein's testimony*

Epstein, who had reported to the scene, found Jordan in the ambulance, crying, appearing frightened and distraught. He only spoke to her for about a minute. Jordan told him that appellant had punched her in the face several times and thrown her to the ground; that's how she injured her right arm.

Epstein spoke with Jordan about 30 to 35 minutes later in the hospital. Jordan explained that they had fought about money in that appellant was upset that Jordan did not get more money for the jewelry that she pawned. Jordan related that she walked into the garage, where she saw appellant talking on the phone; he appeared to be angry. She, too, was angry and started shouting at appellant. Appellant got off the phone, stood up and started rushing at Jordan. He grabbed Jordan's cane, threw it on the ground, and then "punched her in the face four, five times with his right fist. After punching her, he grabbed one of her legs, lifting it up, causing her to fall to her back. As soon as she was on her back, the defendant straddled the victim and punched her two, three more times in the face." He next put his forearm on her neck and said, "Give me the fucking money that you got." When she said okay, he let her up and she attempted to run out of the garage. He caught her, dragged her back by her neck and threw her on the ground. He said, "Give me the fucking money or I'm going to kill you, bitch." She again agreed, got up and was now able to get away and call 911.

Epstein found Jordan's answers to his questions responsive and detailed; she appeared to have no trouble remembering events. She did not complain about pain to her face, neck and lower back. The left side of her face showed no sign of injuries.

## DISCUSSION

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Conflicts and even testimony which is subject to

4

justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

We begin with the circumstance that, in this case as in many spousal abuse cases, the determination to what extent the victim's courtroom testimony is to be believed is particularly sensitive and difficult. The "reading" of the victim's manner, tone and inflections of voice, and physical demeanor is much more a matter of the eye and ear than of the actual words spoken. It is therefore literally not possible to replicate in a reviewing court the actual body of evidence that is before the finder of fact. The principle that credibility determinations are for the finder of fact is therefore of particular importance in cases such as the one at bar.

This is not a case where the victim's in-court testimony and prior statement are wildly inconsistent. Both statements relate the sequence of events the same way. That is, Jordan arrives in the garage, sees appellant on the telephone, the altercation erupts, they fall on the floor, appellant strikes Jordan, there is a demand for the money, Jordan tries to flee, is caught but finally escapes. Importantly, both versions agree that there was, in fact, a physical altercation involving blows. Thus, this is not a case where a stark decision has to be made between two completely inconsistent stories. While it is clear that the statements differ in that the in-court testimony makes Jordan the aggressor, beyond that point the difference is more one of nuance than substance.

Given this aspect of the case, it is a perfectly reasonable conclusion that in court Jordan tried to tamp down the actual altercation to shield appellant but that the actual story about the altercation was much more like the one she related to Epstein.

Be that as it may, which version to believe is paradigmatically a question for the jury.

Before turning to appellant's contentions, we note that even under Jordan's in-court testimony, there is evidence of battery. She testified that after they both fell to the

5

floor, appellant landed on top of her and began slapping the left side of her head with an open hand. As respondent correctly points out, a slight offensive, unprivileged touching is a battery. (*People v. Ausbie* (2004) 123 Cal.App.4th 855, 860, fn. 2.) Slaps to the head qualify as battery. On the other hand, if Jordan's in-court testimony is followed, it would need to be sorted out to what extent, if any, these slaps were self-defense.

Appellant recognizes that credibility is for the finder of fact. Appellant contends, however, that Epstein's "credibility is of limited value" because his testimony "does nothing to counter Jordan's sworn testimony that she was lying to Deputy Epstein during her extrajudicial unsworn account of the incident."

It is not Epstein's but Jordan's credibility that is at issue; there is no reason to doubt that he accurately recounted what Jordan told him in the hospital. While she testified that she lied about "most of it" in her statement to Epstein, she also testified that she loved her husband and that she wanted to be with him. She was not required to say she loved her husband but, given her testimony in court, she could hardly do anything else than to repudiate her statement to Epstein. All of this makes sense from a human perspective. None of it detracts from the basic fact that it was the jury's province to decide whether to believe Jordan's in-court testimony. As noted, the only important divergence between her testimony and her statement was that the former characterized her as the initial aggressor. Given her relationship with her husband, it was not unreasonable for the jury to simply discount this part of her testimony.

Appellant contends that Jordan's sworn testimony is to be preferred to her "unsworn extrajudicial account" that she repudiated. This is a somewhat simplistic view. An unsworn statement made right after the confrontation, when Jordan was free of appellant's influence and apparently was not thinking about her marriage, seems more reliable than courtroom testimony that could send her husband to prison. Testimony is not merchandise with fixed characteristics, making sworn testimony inevitably superior to an unsworn statement. The witnesses' motivations may render the statement superior to testimony.

Appellant contends that this case is like *In re Miguel L.* (1982) 32 Cal.3d 100, 110, where the court held that the unsworn, repudiated statement of an accomplice was not sufficient evidence to sustain a burglary conviction. But we are not dealing with an accomplice in this case. The question is whether to believe a wife who wants to keep her husband out of prison; the jury chose not to believe her. We cannot say that this decision was surprising or one that the jury was not qualified to make.

Appellant claims that "Jordan testified with great certainty that she deliberately lied to Deputy Epstein" and that we should therefore reject her statement to Epstein. We cannot see where the record supports the words "great certainty" and "deliberately." But no matter how appellant seeks to dress up the argument, the fact is that the question appellant seeks to retry in this court was resolved by the jury.

In his reply brief, appellant states that the prosecution failed to present evidence that Jordan's "prior inconsistent statements" were true. The prosecution was not required to present evidence that Jordan's statement to Epstein was true. There is no support in the law for this claim, and appellant cites none. It is also simply untrue that once Jordan disavowed her statement to Epstein, "the prosecution was left with nothing." The jury was free to reject Jordan's disavowal, as it obviously did.

The nuanced verdicts that were returned shows a jury aware of its responsibilities. While the evidence is in conflict, we do not sit to resolve the conflict or reweigh credibility determinations of the jury. (*People v. Maury*, *supra*, 30 Cal.4th at p. 403.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        BOREN, P.J.

We concur:


ASHMANN-GERST, J.          CHAVEZ, J.

7